**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**SHAWNA M. DILAURO,**                    Case No. 5:19 CV 2691

    Plaintiff,                    Judge James Gwin

    v.                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                    **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Shawna M. Dilauro ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 15, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in February 2017, alleging a disability onset date of January 5, 2016. (Tr. 192). Her claims were denied initially and upon reconsideration. (Tr. 94, 107). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 129-30). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 13, 2018. (Tr. 31-59). On November 29, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-23). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on November 15, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in October 1976, making her 39 years old as of the alleged onset date, 41 years old the day of her hearing, and 42 when the decision was issued. *See* Tr. 33. She is a high school graduate, where she received computer office system training, and she attended one semester of college. (Tr. 34-35). Plaintiff previously worked as a collections representative and an invoice clerk. (Tr. 35-37). She has not worked full-time since her alleged onset date. (Tr. 205).

At the hearing, Plaintiff testified she rarely drove due to her anxiety. (Tr. 34). She mentioned issues in her past made her want to avoid men. (Tr. 39). She told the ALJ she felt like a burden on everyone and that she did not want to live. (Tr. 41). Her mental health symptoms have gotten worse, she said; "there's still a lot of crying, depression involved" despite mental health treatment and medication. (Tr. 44). She testified she lacked the ability to pay attention through a 30-minute television show. (Tr. 50). Plaintiff struggled with irritability, causing both physical and verbal fights as recently as a month before the hearing. (Tr. 51). Plaintiff suffered panic attacks at least every three days. *Id.* She also experienced memory problems. (Tr. 52).

Plaintiff testified a caseworker checked in to keep her functioning and attending her appointments. (Tr. 45). A lot of days, Plaintiff did not like to do basic activities of self-care, like bathing and dressing. (Tr. 46). She rarely went places alone to combat her anxiety symptoms. *Id.* About three or four days per week, she had nightmares that recalled past abusive relationships, which caused worse depression symptoms. (Tr. 49-50). She struggled to sleep, and usually took multiple hour-long naps throughout the day. (Tr. 49).

Plaintiff testified she had undergone neck surgery. (Tr. 41). The neck problems persisted on her left side, though her right side improved. (Tr. 43). She continued to suffer constant numbness and tingling through her arms and into her fingers. (Tr. 46-48). She also testified she could not lift over her shoulders, her arms shook, and she would drop objects. (Tr. 47-48). More recently, Plaintiff experienced problems with her left ankle, including swelling, that made walking difficult. (Tr. 44, 47-48).

This is Plaintiff's third claim for benefits, all of which have been unsuccessful. *See* Tr. 13, 63. Her first claim was denied on June 19, 2013. (Tr. 63). The second decision, issued on December 31, 2015, found new and material evidence in the intervening time, but still found Plaintiff not disabled. (Tr. 75.)

Relevant Medical Evidence

*Physical Medical Records*

Plaintiff met with Dmitri Souzdalnitski, M.D., a pain management specialist, on January 7, 2016. (Tr. 354-56). She reported persistent pain which affected her daily routine, and that pain had not responded to physical rehabilitation and medications. (Tr. 354). Dr. Souzdalnitski noted, *inter alia*, decreased range of motion and paravertebral tenderness in Plaintiff's lumbosacral and cervical/thoracic spine. *Id.* Dr. Souzdalnitski diagnosed Plaintiff with myofascial pain, cervical facet arthropathy, degenerative disc disease, dizziness, lumbar degenerative disc disease, and sacral pain. (Tr. 355). He instructed Plaintiff not to drive and ordered bilateral cervical medial branch blocks at C3-5 and a physical/occupational therapy evaluation. *Id.*

A January 11, 2016 x-ray of Plaintiff's cervical spine showed mild to moderate degenerative changes involving C5-C6 and C6-C7, with no significant change compared to the prior exam. (Tr. 642).

3

In February 2016, Plaintiff met with Leila Boville, C.N.P., for an internal medicine appointment. (Tr. 483-85). Ms. Boville assessed unspecified fatigue and acute sinusitis. *Id.*

In April 2016, Vicki Jessop, N.P., met with Plaintiff for a pain management follow-up visit. (Tr. 347-49). Plaintiff told Ms. Jessop she had continued neck pain, rated at ten out of ten, radiating to both shoulders. (Tr. 347). Pain kept Plaintiff from sleeping, and medications and compound cream did not offer much relief, while physical therapy and chiropractic treatment increased her pain. *Id.* Ms. Jessop observed moderate paraspinal tenderness in the cervical/thoracic spine, positive Spurling on the right, and limited, painful cervical flexion, extension, and rotation. *Id.* Ms. Jessop referred Plaintiff to an orthopedic surgeon. (Tr. 348).

In July 2016, Plaintiff met with William Novak, M.D., a neurologist. (Tr. 450-52). She complained of dizziness and seeing spots, neck pain, numbness and tingling in her arms, and fatigue, among other symptoms. (Tr. 450). Dr. Novak ordered an EEG. (Tr. 452). That EEG was performed in October 2016, and the results were normal. (Tr. 315-16)

In March 2017, Plaintiff met with Kaitlyn Sheppard, M.D., primarily complaining of neck pain on her left side and right shoulder pain. (Tr. 475). Plaintiff told Dr. Sheppard she had completed physical therapy, which she did not think improved her symptoms, and that she had been avoiding surgery. *Id.* Plaintiff said she could not move her right arm more than 90 degrees without pain limiting her movement, and she requested a cortisone shot to help this. (Tr. 476). Dr. Sheppard noted a decreased range of motion in Plaintiff's neck, tenderness along the left trapezius muscle, decreased sensation throughout the right arm, decreased grip strength in her right hand, and right shoulder mobility limited to slightly above a 90-degree angle by pain. (Tr. 479). She diagnosed Plaintiff with neural foraminal stenosis of the cervical spine. *Id.*

4

Later in March 2017, Plaintiff went to the emergency room complaining of chest pain, severe and sharp pain in her left arm, along with tingling, and a history of cervical disc disease. (Tr. 568). Notes from the visit show Plaintiff had tenderness in her left pectoral area, and in the cervical spine and paraspinous muscle area. *Id.* Kevin Markowski, M.D., believed the chest pain was musculoskeletal in nature, and noted his concern that Plaintiff's arm pain was radiculopathy. (Tr. 572).

In April 2017, Plaintiff followed up with Dr. Souzdalnitski for pain management. (Tr. 618). She continued her complaint of severe pain in her left arm, accompanied by weakness, numbness, and tingling. *Id.* A physical examination showed a somewhat decreased range of motion and paravertebral tenderness of the cervical/thoracic spine, positive axial loading, positive Spurling on the left, myofascial tender points, limited shoulder abduction, left arm dysesthesias, and decreased sensations to light tough in the left C4-C6 distribution. (Tr. 619). She denied suicidal ideation. *Id.* Dr. Souzdalnitski assessed cervical spinal stenosis; cervical radiculopathy; degenerative disc disease, cervical; facet arthropathy, cervical; myofascial pain, and other insomnia. *Id.* He referred Plaintiff to a neurosurgeon and ordered an x-ray and EMG/nerve conduction test. (Tr. 620). The X-ray showed no fracture or malalignment of the cervical vertebrae, spurring about the endplates at C5-C7, minimal disc space narrowing at C5-C6 and C6-C7, and no instability with flexion or extension. *Id.* The EMG/nerve conduction test of both her arms revealed unremarkable findings. (Tr. 676-79).

Also in April 2017, Plaintiff underwent an MRI of her cervical spine. (Tr. 486-88). The imaging revealed degenerative disc disease with posterior longitudinal ligament hypertrophy, and component of congenital canal narrowing causing significant flattening of the cervical cord at the C5/C6 levels, and central canal stenosis at C4/C5. (Tr. 488).

5

Later in April, Plaintiff met with Jeremiah Coffey, D.C., complaining of left-sided neck pain radiating down the left arm, accompanied by numbness and tingling. (Tr. 616-17). Plaintiff told Dr. Coffey her pain score was a ten, and that the pain began "about five years ago". *Id.* Dr. Coffey observed restricted forward and lateral bending of the cervical spine, with tenderness, muscle spasms, and fixation and misalignment in the cervical spine. *Id.* He performed a chiropractic manipulation of her cervical and lumbar spine. (Tr. 617).

Plaintiff returned to the emergency room on April 26, 2017, complaining of chest pain, left arm pain, shortness of breath, and nausea. (Tr. 546). She was negative for neck pain, back pain, and weakness. *Id.* A physical examination revealed mild tenderness to palpitation over the left paravertebral muscles of the cervical spine. (Tr. 547). A chest X-ray showed mild left convexed dorsal spine curvature. (Tr. 560).

In May 2017, Rajiv Taliwal, M.D., evaluated Plaintiff. (Tr. 664). Dr. Taliwal, an orthopedic surgeon, observed partial range of motion in the cervical spine, and pain with extension. (Tr. 666). An MRI revealed cervical spondylosis most prominent at C5-C7. (Tr. 663). Dr. Taliwal diagnosed Plaintiff with spinal stenosis in the C5-C7 region and recommended surgery. (Tr. 667).

Later in May, Plaintiff met with Michael Walch, M.D. (Tr. 699). Plaintiff reported neck pain radiating down both arms, accompanied by some numbness in her left fingertips. *Id.* She had a decreased range of motion with extension of her neck, along with tenderness in her paraspinal muscles. *Id.* Dr. Walch noted Plaintiff had four out of five arm strength and decreased sensation in her second and third fingertips. (Tr. 670). Dr. Walch assessed degenerative disc disease causing flattening of the cervical cord at C5-C6 and C6-C7. *Id.*

On May 23, 2017, Plaintiff underwent an anterior cervical decompression and fusion at C5-C6 and C6-C7 with LASR allograft and ZEVO plate. (Tr. 652, 662). X-rays taken the next

day, July 24, and December 11 all continued to show mild cervical spondylosis. (Tr. 649, 799, 820).

At an early June post-operative visit, Dr. Taliwal noted no strength loss nor any lost in sensation in Plaintiff's arms and hands. (Tr. 646-48).

Later in June, Plaintiff met with Dr. Walch complaining of sleeping problems, stress, racing thoughts, and nasal congestion. (Tr. 694). She had normal ranges of motion. *Id.* Dr. Walch diagnosed insomnia. (Tr. 695).

Plaintiff followed up with Dr. Taliwal again in July 2017. (Tr. 815). She said her pain level was a five out of ten scale, and her neck was unchanged from her prior appointment. *Id.* Despite being previously encouraged to do a home exercise program, Plaintiff was not doing so. (Tr. 818).

At an August 2017 physical therapy appointment, Melissa Bowman, PT, assessed Plaintiff with an impaired and painful range of motion of the cervical spine in all planes, as well as in the shoulder joints. (Tr. 812). Ms. Bowman planned to meet Plaintiff one to two times per week for ten to twelve visits to improve her symptoms. (Tr. 813).

In December 2017, Plaintiff met again with Dr. Taliwal complaining of gradually worsening symptoms. (Tr. 800). She seemed to get worse during physical therapy. *Id.*

Plaintiff met with Dmitri Souza, M.D., in February 2018 for pain management. (Tr. 927). Her radiating pain resolved after the surgery. *Id.* She still had pain in her neck and both arms. *Id.* Plaintiff had a somewhat decreased range of motion in the cervical/thoracic spine, paravertebral tenderness, positive axial loading, negative Spurling, and significant muscle spasm over the posterior and lateral neck muscles. (Tr. 928). She also had a limited range of motion in the lumbosacral spine. *Id.*

In April and May 2018, Plaintiff saw Dr. Coffey for chiropractic treatment and he performed a manipulation of the lumbar and cervical spine. (Tr. 922, 925).

In May 2018, Plaintiff again saw Dr. Taliwal for a post-operative visit. She complained of pain, numbness, and tingling in both arms, and back pain radiating to her left leg. (Tr. 933-34). She was favoring her left leg, and still had a limited and painful range of motion in her cervical and lumbar spine. (Tr. 935). An X-ray revealed lumbar spondylosis and pseudoarthrosis at C5-C7. (Tr. 931-32). Dr. Taliwal diagnosed lumbar back pain with radiculopathy affecting her left leg, and pseudoarthrosis of the cervical spine. (Tr. 937).

Also in May 2018, Plaintiff met with Diana Balisbis, M.D. (Tr. 867). She complained of low back pain with radiation, left foot pain and tightness, and depression. (Tr. 867-68). Dr. Balisbis observed CVA tenderness on her left side, with spinal tenderness and a swollen left foot. (Tr. 871). She was diagnosed with acute left-sided low back pain with left-sided sciatica and plantar fasciitis in her left foot. *Id.*

In August 2019, Plaintiff saw Reed Graham, D.P.M., for an unstable feeling and some pain in her ankles. (Tr. 918). X-rays showed an old, three-millimeter dorsal navicular avulsion-type fracture. *Id.* Plaintiff told Dr. Graham her ankle had been in pain for over a year. *Id.* Dr. Graham noted pain and a limited range of motion in her left ankle. *Id.*

In January 2019, Dr. Taliwal prescribed Plaintiff an Orthofix External Bone Growth Stimulator to assist with fusion recovery, which she was to wear for four hours per day for at least three months. (Tr. 287).

*Mental Health Records*

Plaintiff saw Bradly Winkhart, M.D, five times in 2016. (Tr. 399-422). She told him she was involved in a car crash, suffered panic and anxiety symptoms, and that those symptoms

increased when she drove. (Tr. 400). Plaintiff reported her medications were helping her symptoms in January, but by April she wished to change her medications. *Id.* In July, she had continued struggling with depression symptoms though the medication was helping. *Id.* By December she wished to continue using the same medications. *Id.* Dr. Winkhart noted Plaintiff had an agitated demeanor in April (Tr. 418), July (Tr. 412), September (Tr. 407), and December (Tr. 401). He diagnosed her with recurrent, moderate depressive disorder and posttraumatic stress disorder. (Tr. 402, 408, 414, 420).

Plaintiff met with Edward Pierson, M.D., a psychiatrist, three times in 2017 – in January (Tr. 393-98), July (Tr. 710-14), and September (Tr. 861-66). She reported various mental health symptoms. *Id.* In January, Dr. Pierson noted Plaintiff had an average, cooperative demeanor, with a full, labile affect and unremarkable thought content. (Tr. 395). He also noted no current suicidal or homicidal ideation. *Id.* In July, Dr. Pierson described Plaintiff as alert, oriented, calm, and cooperative. (Tr. 711). He noted she had a constricted, labile, and congruent affect, and was tearful at times. *Id.* He continued to note a lack of homicidal or suicidal ideation. (Tr. 712). In September, Dr. Pierson noted passive suicidal thoughts. (Tr. 863). He diagnosed PTSD and moderate recurrent major depressive disorder in January. (Tr. 396). He added a moderate anxious distress diagnosis to her depression disorder in July. (Tr. 712).

Plaintiff met with Tammy Morris, P.C.C.-S, five times between February 2017 and July 2017. (Tr. 465-74, 534-44, 715-24). Notes from January 2017 show Plaintiff had poor follow up and participation and would arrive for "crisis [appointments]". (Tr. 467). At a February visit, Plaintiff complained of frequent crying spells. (Tr. 465). During that visit, Ms. Morris noted Plaintiff had a demanding demeanor, cooperative and agitated behavior with avoidant eye contact.

9

(Tr. 465-66). No suicidal ideation was reported, and Ms. Morris noted the focus of the session was getting Social Security forms filled out. (Tr. 466).

In March 2017, Ms. Morris noted Plaintiff was agitated and demanding, with avoidant eye contact. (Tr. 470). A lack of suicidal ideation was noted again, as was Plaintiff's focus of the session being on getting Social Security forms completed. (Tr. 471). Ms. Morris noted Plaintiff had impaired attention/concentration. *Id.* A second March appointment, an April appointment, and a May appointment showed substantially similar mental health statuses. (Tr. 534-36, 539-41, 720-22). Plaintiff did not see Ms. Morris again until July, and while she complained of neck pain and other pain management issues, her mental health stayed substantially the same. (Tr. 715-17).

In October 2017, Plaintiff was hospitalized and diagnosed with suicidal ideation. (Tr. 749). She said she had daily thoughts of suicide and did not try to stop these thoughts, she was somewhat likely to act on these thoughts, and she had never previously attempted suicide. (Tr. 757). She was discharged after two days in the hospital, at which time she had a greater degree of hope for herself and lacked suicidal ideation. (Tr. 765).

Plaintiff met with Alan Shimer, M.D., a psychiatrist, nine times between November 2017 and July 2018, complaining of, *inter alia*, anxiety, depression, occasional suicidal ideation, a lack of improvement from her medications, and frequent crying. (Tr. 826-60, 888-916). Dr. Shimer diagnosed severe and recurrent major depressive disorder, PTSD, and unspecified personality disorder. (Tr. 830).

Plaintiff was hospitalized again with suicidal ideation on August 30, 2018, where she remained through September 10, 2018. (Tr. 945-69). Her progress while hospitalized was "very slow". (Tr. 946). In a discharge summary, David Deckert, M.D., noted Plaintiff refused various

interventions and offered aftercare. (Tr. 946-47). Her mental status at discharge was generally improved and she no longer expressed suicidal ideation. (Tr. 947).

Opinion Evidence

On March 9, 2017, Joseph Edwards, Ph.D., adopted Plaintiff's the mental RFC from Plaintiff's second ALJ decision, citing Acquiescence Ruling ("AR") 98-4, 1998 WL 274052. (Tr. 89). He found Plaintiff could "understand, remember, and carry out simple routine tasks that can be learned in 30 days or less in an environment that is static, defined as no more than having occasional changes. The work must be low stress work, she can have occasional contact with the public, frequent and superficial interaction with coworkers but cannot perform group tasks". *Id*. On May 15, 2017, Leslie Rudy, Ph.D., came to the same conclusion on reconsideration. (Tr. 105-06).

On April 2, 2017, Gail Mutchler, M.D., adopted Plaintiff's the physical RFC from Plaintiff's second ALJ decision, citing AR 98-4, 1998 WL 274052. (Tr. 91). She found Plaintiff could perform light work, but never climb ladders, ropes, or stairs, occasionally crawl, frequently kneel and crouch, occasionally reach overhead with both arms, frequently handle with both arms, and must avoid exposure to unprotected heights or hazardous machinery. *Id*. On May 15, 2017, Leigh Thomas, M.D., came to the same conclusion on reconsideration. (Tr. 104-05).

VE Testimony

A vocational expert testified at the hearing before the ALJ. (Tr. 53-58). The ALJ asked the VE to consider an individual with Plaintiff's age, education, and work experience, who was limited in the way the ALJ in the instant case determined Plaintiff was. (Tr. 54). The VE determined such an individual could not perform past work, but could perform other jobs in the national economy, such as non-postal mail clerk, garment sorter, and night cleaner. (Tr. 55).

ALJ Decision

In her November 29, 2018 written decision, the ALJ first found *Drummond v. Comm'r of Soc. Sec*, 126 F.3d 837 (6th Cir. 1997) applied to this case. (Tr. 13-14). She found Plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 16). She also concluded Plaintiff had severe impairments of: degenerative disc disease of the cervical spine with herniation, stenosis, and radiculopathy status post-decompression and fusion surgery; myofascial pain syndrome; carpal tunnel syndrome; bipolar disorder; post-traumatic stress disorder; mood disorder; anxiety disorder; major depressive disorder; personality disorder, unspecified; and adjustment disorder. *Id.* However, the ALJ found none of those impairments—individually or in combination—met or medically equaled the severity of a listed impairment. (Tr. 17). The ALJ concluded Plaintiff had the RFC

> to perform light work as defined in 20 CFR 416.967(b) except can never climb ladders, ropes or scaffolds; can occasionally crawl and frequently handle bilaterally; must avoid exposure to moving machinery and unprotected heights; can perform simple routine tasks in an environment free of fast-paced production requirements or high production quotas and with only occasional changes; can have superficial interaction with others meaning no work involving arbitration, negotiation, confrontation, directing the work of other or being responsible for the safety of others; have occasional interaction with the general public; can have frequent interaction with coworkers but cannot perform group tasks.

(Tr. 18)[1]. The ALJ then found Plaintiff unable to perform any past relevant work, (Tr. 21), but found jobs in significant numbers in the national economy (Tr. 22). Therefore, the ALJ found Plaintiff not disabled. (Tr. 23).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

---

1. This RFC is adopted from Plaintiff's prior disability claim. *See* Tr. 69.

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

13

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises two arguments. (Doc. 13, at 1). First, Plaintiff argues the ALJ erred by not applying the correct legal standard when deciding whether the prior RFC had to be adopted in the instant case. *Id.* Second, she argues the ALJ erred by not finding her disabled under Listing 12.04. *Id.* For the following reasons, the undersigned finds remand is necessary.

*Drummond/Earley*

First, Plaintiff argues the ALJ failed to give her medical records the "fresh look" required by the Sixth Circuit. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018). The ALJ in this case reviewed the medical records from Plaintiff's unadjudicated time period, but she started her analysis by citing and applying *Drummond v. Comm'r of Soc. Sec.*, *Earley*'s predecessor, writing:

> *Drummond* is clearly applicable to this case. The claimant filed a prior application and was found not disabled pursuant to a decision from an administrative law judge (ALJ) issued on December 31, 2015 (Exhibit C1A). In that decision, the ALJ found that the claimant retained the residual functional capacity to perform light work in

14

a job that provides only occasional contact with the public and she had the capacity to perform unskilled work with no prolonged walking, repetitive bending, stopping, twisting, or turning. (Id. at 10).

I find that no new and material evidence exists pertaining to the current period of adjudication that would provide a basis for finding a different residual functional capacity. While the claimant's attorney argues that the claimant's condition has worsened, I find that any such purported changes are not material. Therefore, I find that no significant new and material evidence exists to justify not adopting the residual functional capacity from the previously adjudicated period.

(Tr. 13-14). This, Plaintiff argues, violates *Earley*'s "fresh look" command, because the ALJ presumed the prior RFC remains accurate and reviewed the new medical evidence from that perspective. (Doc. 13, at 18). The Commissioner argues the ALJ's actual review of the evidence is all the fresh look Plaintiff is entitled to, and thus there is no error under *Earley.* For the following reasons, the undersigned agrees with Plaintiff, and finds remand is necessary for the reconsideration of new medical evidence in compliance with *Earley*.

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997); *Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. 2015). In that case, the claimant's initial claim for SSI was denied when an ALJ found that the claimant retained an RFC for sedentary work. *Drummond*, 126 F.3d. at 838. When the claimant later re-filed her disability claim, a second ALJ found that the claimant retained an RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839. After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of

an improvement in the claimant's condition. *Id.* at 841-42. "Just as a social security claimant is

barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

In response to *Drummond*, the Social Security Administration promulgated AR 98–4(6),

which explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3 (footnote omitted).

Prior to the ALJ's decision in the instant case, the Sixth Circuit clarified the scope of

*Drummond* in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018). In *Earley*,

the Sixth Circuit clarified *res judicata* applies to subsequent applications for "the same period of

time [ ] rejected by the first application." *Id.* at 933. The Sixth Circuit further reasoned:

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." *Id.* at 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.
>
> All of this helps to explain why *Drummond* referred to "principles of *res judicata*" – with an accent on the word "principles." 126 F.3d at 841-843. What are those

16

principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842, *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Earley*, 893 F.3d at 933.

Some district courts have interpreted *Earley* as the Commissioner does in this case, to mean that the ALJ must simply review the evidence for the new relevant time period to see if the prior RFC must change to accommodate it. *See* Doc. 15, at 8; *Williams v. Comm'r of Soc. Sec.*, 2019 WL 3356666 at *8 (N.D. Ohio) ("Because it is apparent the ALJ took a fresh look at the new evidence accruing from the time-period post-dating the prior unfavorable decision, the ALJ's decision to adopt the same mental restrictions as existed in the prior RFC did not offend any of the principles set forth in *Earley*."); *Brent v. Comm'r of Soc. Sec.*, 2018 WL 5118598, at *4 (E.D. Mich.), *report and recommendation adopted*, 2018 WL 4403418. The ALJ in this case complies with this understanding of *Earley*, by considering the new evidence with the old RFC as her starting point, and doing so in some depth. *See* Tr. 13-14, 18-21.

But other district courts have read *Earley* to mean a claimant is entitled to review absent the presumption that the prior RFC remains the correct RFC for the subsequent claim. *See, e.g.*, *Hogren v. Comm'r of Soc. Sec.*, 2020 WL 830401, at *4 (S.D. Ohio), *report and recommendation adopted*, 2020 WL 1140058 ("Thus, notwithstanding the new and additional evidence before her, ALJ Southern did not simply treat ALJ Flebbe's decision as a 'legitimate, albeit not binding consideration' as *Earley* directs, but rather explicitly concluded that ALJ Flebbe's previous evaluation of Plaintiff's medical records was binding."); *Ferrell v. Berryhill*, 2019 WL 2077501, at *5 (E.D. Tenn.) ("The point of *Earley*, in this Court's opinion, is that regardless of her chances

of success, an applicant should have the opportunity for a full hearing, with no presumptions applied, when the claim covers a new period of time not addressed in the prior hearing."); *Dunn v. Comm'r of Soc. Sec.*, 2018 WL 4574831, at *3 (W.D. Mich.) ("In performing this analysis, ALJ Jones' decision was essentially a review of ALJ Moscow Michaelson's RFC findings . . . rather than a 'fresh review' of plaintiff's 'new application for a new period of time.'"); *Gale v. Comm'r of Soc. Sec.*, 2019 WL 8016516, at *5 (W.D. Mich.), *report and recommendation adopted*, 2020 WL 871201 ("In sum, *Earley* stands for the proposition that when an ALJ evaluates a subsequent application for benefits, covering a distinct period of time, the ALJ can properly consider a previous ALJ's RFC assessment and errs only when he considers the previous RFC a mandatory starting point for the analysis.").

These courts have the better understanding of *Earley*. Following the Sixth Circuit's logic, Plaintiff's present SSI claim is for January 5, 2016 (Tr. 13) through November 29, 2018, (Tr. 23)[2]. This claim is entirely distinct from Plaintiff's prior SSI claim, which ended on December 31, 2015, when the ALJ issued a written decision denying that claim. (Tr. 76); *Earley*, 893 F.3d at 933 (quoting *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)) ("Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.").

Even if little to no new evidence is presented for a second application, the prior ALJ decision does not bind the subsequent ALJ. *Earley*, 893 F.3d at 933. This case, however, has a great deal of new evidence, including a spinal fusion surgery and two psychological hospitalizations. (Tr. 652, 662, 745-97, 945-69) And the ALJ considered this new evidence (Tr.

---

2. The claim runs from the alleged onset date described in Plaintiff's application, through the date of the written decision.

19-20), but from a starting point of evaluating whether it was compatible with the prior RFC (Tr. 13-14). That violates the statutory framework governing disability claims. *Willis v. Sullivan*, 931 F.2d 390, 397 (6th Cir. 1991) ("A claimant, with each claim she brings for an unadjudicated time period, is entitled to a *de novo* review of the medical evidence.") (citing 42 U.S.C. § 405(b)). And the *Earley* court recognized nothing in the statute permits deviating from that standard when a claimant has previously been denied. *Earley* 893 F.3d at 933 ("When an individual seeks disability benefits for a distinct period of time, each application is entitled to review. There is nothing in the relevant statutes to the contrary.").

Here, the ALJ did not give the evidence a fresh look to determine Plaintiff's RFC, and for that reason, the case must be remanded. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) ("Howard's RFC is to be an 'assessment of [her] remaining capacity for work' once her limitations have been taken into account . . . It is an assessment of what Howard can and cannot do".) (citing 20 C.F.R. § 416.945). It is possible the ALJ will come to the same conclusion as she did in the decision being reviewed now. But Plaintiff remains entitled to a full hearing with additional procedural burden to overcome, and she has not gotten that yet. *Earley*, 893 F.3d at 934 ("All roads in the end lead to this destination: The ALJ should have another opportunity to review the application under the correct standard."); *Ferrell*, 2019 WL 2077501, at *6 ("The application of the presumption in AR 98-4(6), interpreting *Drummond,* creates an unwarranted procedural burden for claimants at the second hearing … the Court finds Plaintiff is entitled to a new hearing"). Thus, the ALJ should review Plaintiff's records again, but without a presumption that the prior RFC remains the proper RFC.

Listing 12.04

Because the *Earley* error discussed above requires remand, the undersigned declines to address the arguments regarding whether Plaintiff's impairments satisfied Listing 12.04. On remand, the Commissioner should re-evaluate Plaintiff's claim, including at Step Three, under the *Earley* "fresh look" standard.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI not supported by substantial evidence and recommends the decision be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g).


  s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).